IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

KALVIN DONNELL COWARD,       )
                             )
         Plaintiff           )
                             )
    v.                       )      No. 1:10-cv-147 (LMB/MSN)
                             )
A. DAVID ROBINSON, Chief of Corrections )
  Operations, et al.,        )
                             )
         Defendants.         )

<u>MEMORANDUM OPINION</u>

Plaintiff Kalvin Donnell Coward ("Coward" or "plaintiff"), an inmate of the Virginia

Department of Corrections, alleges that the defendants, A. David Robinson, Chief of Corrections

Operations, and Harold W. Clarke, Director, in their capacities as employees of the Department

(the defendants will be referred to collectively as "VDOC" or "the Department"), unlawfully

impeded his religious exercise as an adherent of the Nations of Gods and Earths ("NGE" or "the

Nation"), in violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA")

and the First Amendment by refusing to recognize the NGE as a religion and instead designating

it a gang subject to the Department's zero tolerance policy. Specifically, plaintiff alleges four

violations of RLUIPA based on the VDOC's 1) refusal to recognize the NGE as a religion

pursuant to his December 15, 2008 request for recognition and failure to follow proper

procedures when reviewing that request; 2) failure to recognize the NGE or follow proper

procedures in response to plaintiff's March 1, 2009 request for recognition; 3) confiscation of

religious material entitled "The Harlem Six" from his mail on June 25, 2009; and 4) confiscation

of "Five Percenter literature" from his mail on July 16, 2009. Plaintiff also asserts a fifth claim

for theological discrimination in violation of the Free Exercise Clause of the First Amendment.[1] [Dkt. No. 7-1]. Plaintiff asks the Court to enjoin the VDOC from enforcing policies that prevent him from practicing the activities that are central to his beliefs as a member of the NGE and order that the NGE be afforded the privileges enjoyed by other religions recognized by the Department. Id. at 30. For the reasons that follow, the Court finds that the VDOC's policies violate Coward's rights under both RLUIPA and the Free Exercise Clause of the First Amendment.

## I.    PROCEDURAL HISTORY

Plaintiff filed his initial complaint pro se and litigated the case pro se for several years during which the complaint was amended, multiple motions were filed, and several dispositive motions were granted. Plaintiff successfully appealed the dispositive rulings, resulting in three remands. After the third remand, the Court vacated its previous order granting defendants' Motion for Summary Judgment and ordered defendants to file a renewed Motion for Summary Judgment within thirty days. [Dkt. No. 130]. Defendants were granted multiple extensions of time based on the representation that the parties were attempting to settle this litigation. [Dkt. Nos. 138, 140, 149, and 151]. During his third appeal, plaintiff secured pro bono counsel who have continued to represent him before this Court. Ultimately the parties were unable to reach a resolution, and on January 3, 2017 the Court issued a scheduling order giving the parties four months to complete any additional discovery. [Dkt. No. 154]. Following the close of discovery,

---

[1] Although there is no indication in the record that plaintiff was ever given leave to add his theological discrimination claim, see [Dkt. Nos. 8, 24, and 37], because the Fourth Circuit understood this claim to be properly raised, and the parties have addressed it in their proposed findings of fact and conclusions of law, the Court will nunc pro tunc grant plaintiff's June 10, 2010 motion to amend [Dkt. No. 7] to the extent that it adds a claim for theological discrimination.

neither party sought summary judgment and the Court held a bench trial on July 13 and 14, 2017. At trial, plaintiff offered testimony from the following witnesses: himself; Rick Panayoty, a twenty-two-year adherent of the NGE and former inmate who was a party in a RLUIPA lawsuit against the New York Department of Corrections regarding recognition of the NGE and who has since been released and is now a senior in college with plans to attend law school; Donald Palmer, a managing editor of the Five Percenter newspaper and cofounder of the National Office of Cultural Affairs for the NGE; Michael Muhammad Knight, Ph.D., a professor of religious studies who has written two books about the NGE; defendant Clarke, the most senior official at the VDOC; and Martin Horn, the former head of the Pennsylvania and New York City departments of correction. Defendants called Reverend John Randall Myers, a religious consultant and private chaplaincy services provider for the Department; Christopher M. Burke, the Central Regional Coordinator for the Operations and Logistics Unit of the VDOC; and defendant Robinson, the second-in-command at the VDOC.

## II. FINDINGS OF FACT

### A. Background on the NGE

Through the testimony of the plaintiff, NGE adherents Panayoty and Palmer, plaintiff's expert Professor Knight, and plaintiff's exhibits, the following facts about plaintiff's beliefs and the NGE were established:[2]

Plaintiff, who has been incarcerated for twenty-three years, has been an adherent of the NGE, also known as the Five Percent Nation, since 1985. Tr. at 7:21-25, 47:19-48:5. The NGE

---

[2] Although the Department cross-examined these witnesses to attempt to undermine testimony about the NGE not being prone to violence, probing, for example, a tense interaction between Professor Knight and some NGE adherents, the defense offered no evidence contradicting the depiction of NGE beliefs other than the testimony of Reverend Myers, which the Court found was unreliable because it was based on insufficient information.

originated within the Nation of Islam ("NOI") and ultimately became a distinct tradition. PX 157

at 7. The NOI was founded by Fard Muhammad in Detroit, Michigan in the 1930s and teaches

that Muhammad was god incarnate. Tr. at 106:2-20. The NGE's founder, Clarence 13X,

originally was an NOI adherent, but, in the 1960s, he "challenged the core [NOI] tenet that God

had been manifested in Fard Muhammad," and he began teaching the NOI's catechism, known

as the 120 Degrees or the Supreme Wisdom Lessons[3] to youths on street corners and basketball

courts in New York. Tr. at 220:19-24; PX 157 at 8. He ultimately founded the Allah Youth

Center in Harlem ("Mecca," in NGE parlance), which remains operational to this day. Id. One of

Clarence 13X's core beliefs was that "if you want to change anything then you should teach

children" because they do not know anything about hate and racism unless they are exposed to it

by adults. Tr. at 107:7-24; PX 157 at 8.

Today, NGE adherents come from all walks of life and include law enforcement officers,

business people, teachers, professors, and people in the medical field. Tr. at 86:11-18. These

adherents believe that every black man is his own god, PX 157 at 9, and should learn to live

righteously through study and self-mastery, Tr. at 11:2-7. In the NGE community, black men are

referred to as "Allah" or "God" and women are referred to as "Earth." PX 157 at 9. As one

scholar described it, a black man "is a God in the sense of being a Creator of his own destiny."

Id. By characterizing black men as gods, NGE adherents argue that they, like members of other

religions, "have a picture of God that reflects their identity." PX 73 at 3.

The 120 Degrees, which is central to both the NGE and the NOI, teaches that "five

percent of society [is] enlightened and reject[s] the belief in a false, unseen deity, instead

---

[3] The 120 Degrees is comprised of a series of socratic lessons—English "C" Lesson (1-36),
Student Enrollment (1-10), Lost-Found Muslim Lesson No. I (1-14), Lost Muslim Lesson No. II
(1-40), and Actual Facts (1-20)—which add up to 120. PX 9 at 10-33; PX 43 at 10.

recognizing the truth of God as the Black Man." PX 157 at 8. Ten percent of people are "the rich[,] the slave makers of the poor, who teach lies to the poor—to believe that the almighty, true, and living god is a spook and cannot be seen by the physical eye." PX 9 at 27. The ten percent are often referred to as devils and the 120 Degrees teaches that a devil "make[s] slaves out of the 85% by keeping them worshiping something he knows they cannot see (invisible) and he lives and makes himself rich from their labor." PX 9 at 25. By contrast, the five percent are tasked with teaching "freedom, justice, and equality to all the human family of the planet earth," also known as "civilizing" people and making them "righteous." Id. at 27. Based on these shared teachings, members of both the NOI and the NGE may identify as Five Percenters, although the label is more commonly associated with NGE adherents. Tr. at 261:13-25.[4]

Although the 120 Degrees includes some problematic statements, such as, "the colored man or the Caucasian is the devil" and "all Muslims will murder the devil, because they know he is a snake and, also, if he be allowed to live, he would sting someone else. Each Muslim is required to bring four devils," id. at 18, 22, plaintiff addressed this potentially incendiary language by offering evidence that, according to NGE teachings, the four devils that NGE adherents strive to "kill" are lust, greed, envy, and hate, Tr. at 20:5-9. More broadly, the 120 Degrees represents "a project in self-mastery" in which devils simply "represent negative personality traits." Tr. at 256:14-23. The devil is usually personified as a white man because during the Atlantic slave trade and the history of the United States, white men worked to "keep the black man down or keep the black man subjugated," Tr. at 24:3-17; however, a black person can also be a devil and Clarence 13X emphasized that "[t]he worst devil is a black devil." PX 75

---

[4] Today, many adherents prefer to identify as "the Nation of Gods and Earths" rather than as "Five Percenters." PX 157 at 8.

5

at 11. Thus, being a devil is ultimately "more about the mentality than it is about the skin color." Tr. at 25:2-8. In keeping with this belief, white people can be members of the Nation. Id. Indeed, although Elijah Muhammad, an early leader of the NOI, taught that white people could know righteousness but could not be righteous, Clarence 13X adopted a white disciple and pronounced him a "righteous man." Id. at 252:20-253:2.

Plaintiff explained that, for NGE adherents, their belief about the pursuit of righteousness and self-mastery through the destruction of negative personality traits speaks to "the ultimate questions of human existence" and their cosmology "teaches a continued existence beyond this dense physical world, a continued existence that most religions refer to as the afterlife." Coward Aff., [Dkt. No. 100-2] ¶ 8. As is taught in the Bible and the Qur'an, many NGE adherents, including plaintiff, believe that "after creating the planet earth, the Supreme Creator formed the primordial waters and dust (black mud) of the earth, the physical structure (body) of the first (original) human beings to exist on earth, and animated these physical structures into existence as sentient beings." Id. ¶ 16. The NGE also teaches that death is "a continuation within the infinite cycle of life. There is no end to life itself, and that which is of life only transforms from one stage of life to another." Id. ¶ 22.

In addition to the 120 Degrees, the NGE's central texts include the Supreme Mathematics, which attaches a value such as "wisdom" or "understanding" to each number;[5] the Supreme Alphabets, which gives a meaning such as "Allah" or "justice" to each letter of the

---

[5] According to the Supreme Mathematics, 1= Knowledge, 2= Wisdom, 3= Understanding, 4= Culture or Freedom, 5= Power or Refinement, 6= Equality, 7= God, 8= Build or Destroy, 9= Born, and 0= Knowledge or Cipher. PX 9 at 5.

alphabet; [6] and the 12 Jewels, which are the values of knowledge, wisdom, understanding, freedom, justice, equality, food, clothing, shelter, love, peace, and happiness. Tr. at 81:14-22; PX 9 at 6; PX 157 at 8-10. NGE adherents use the Supreme Mathematics and Supreme Alphabets to discern meaning, particularly in words and dates. For example, as plaintiff explained, for the date July 13th, the one and the three in 13 stand for knowledge and understanding and when one is added to three it sums to four, which stands for cultural freedom. Tr. at 15:22-16:6. Using the Supreme Alphabets, a word such as "Allah" can be translated to "Arm, Leg, Leg, Arm, Head," which represents man and man as Allah. PX 157 at 12. The Supreme Mathematics, the Supreme Alphabets, and the 12 Jewels are creations of Clarence 13X and make no mention of white devils or violence. Tr. at 100:9-13; PX 157 at 8-9.

The Bible and the Qur'an are also texts that NGE adherents study, although they are not considered central texts. Tr. at 10:6-17. Other relevant literature includes periodicals, such as the Five Percenter newspaper, which "plays an important role in connecting Nation communities around the country." PX 157 at 14. The Five Percenter includes content ranging from reflections on NGE beliefs to letters from adherents, such as the incarcerated man who wrote on November 3, 2009 to share that since joining the NGE he had "achieve[d] many great things" including acquiring his G.E.D. and enrolling in college, which he claimed he "would never have received" "if it wasn't for these life teachings." PX 71 at 10.

NGE adherents are required to engage in daily study of their foundational texts to gain a deeper understanding of their "divine nature and . . . relationship with life and the universe."

---

[6] The Supreme Alphabets states that A= Allah, B= Be or Born, C= See, D= Divine or Destroy, E= Equality, F= Father, G= God, H= He or Her, I= Islam, J= Justice, K= King, L= Love, Hell or Right, M= Master, N= Now or End, O= Cipher, P= Power, Q= Queen, R= Rule or Ruler, S= Self or Savior, T= Truth or Square, U= Universe, V= Victory, W= Wisdom, X= Unknown, Y= Why, and Z= Zig Zag Zig. PX 9 at 7-9.

Coward Aff., [Dkt. No. 100-2] ¶ 23. Individual NGE adherents often compile their personal interpretations of the foundational texts in a collection referred to as the "Book of Life." Tr. at 246:11-18. Collectively, NGE adherents practice their beliefs by attending civilization classes and group meetings called ciphers or parliaments, as well as by observing honor (holy) days. Coward Aff., [Dkt. No. 100-2] ¶ 23. Civilization classes involve adherents coming together to discuss their beliefs and broaden their knowledge by studying topics such as economics and health. Tr. at 21:11-17. At ciphers or parliaments, NGE adherents stand in a circle and build on the day's degree and talk about advancing the Nation. Id. at 21:2-10, 21:18-22:3. "Enlightenment for a Nation adherent is not obtained by private devotion, but through dialogue with other members of the Nation." PX 157 at 13.

NGE adherents observe four honor days. Allah's (Clarence 13X's) Birthday, which the NGE calls Father's Day, is celebrated on February 22 and is marked by fasting and communal reflection on Allah's legacy. PX 152 at 10. Show and Prove Day, which is celebrated on or around June 13, is an opportunity for NGE adherents to show and prove that Allah lives on through them by showcasing their gifts and talents at a community picnic. Id. at 10-12. On the third honor day, the Annual Family Day Event/Allah Social, which is celebrated on the last Saturday in August, NGE adherents gather and invite friends and family members to join in their festivities. Id. at 12. The last honor day, called Day One, is celebrated on October 10 when NGE adherents commemorate the birth of the NGE by reflecting on the history of the NGE and dressing in their traditional colors of black and gold with men wearing Kufis and women wearing head wraps or Galas. Id. at 13.[7]

---

[7] A "Kufi" is "[a] hemispheric cap that can be made of cloth, knitted or crocheted, multi-colored or single colored[,] that may have one or two tassels protruding from the top." Id. at 15. A "Gala" is "[a] piece or several pieces of material worn to cover the women's head[s]." Id.

Like Jews and Muslims, NGE adherents do not eat pork or pork byproducts. Tr. at 18:21-16:2; PX 9 at 12. They also do not eat scavenger animals such as crab and catfish. Id. A Kosher, Halal, or Vegan diet generally conforms to their dietary strictures. Id.; PX 152 at 14. The NGE's symbol is the Universal Flag, which consists of the number 7, the sun, the moon, and a star. PX 152 at 15. NGE adherents display the flag during events and honor days. Id.

Although NGE adherents self-identify as a "God Centered Culture," they explicitly do not identify with the word "religion," emphasizing that historically religion has been a tool of oppression and fosters dependence on external forces. PX 157 at 12; PX 152 at 8. Citing the Crusades and other "so-called Holy Wars," the Five Percenter newspaper argues that "[m]ore wars have been fought and more blood has been shed in the name of religion than any other cause, perhaps all other causes." PX 74 at 3. "All religions say in one way or another that man does not and cannot stand alone. He is vitally related with and even dependent on powers in Nature and Society external to himself." Id. at 8. Despite discomfort with labeling the NGE a "religion," Coward states that the Nation "occupies a place in [his] heart, mind and life parallel to that filled by the orthodox belief in God/a Supreme Being in more mainstream religions which are widely accepted in the United States." Coward Aff., [Dkt. No. 100-2] ¶ 6.

Despite developing predominantly in urban, inner city areas where gang activity is present, the NGE has "vehemently renounced gang activity, and the Nation does not view gang members as part of the [NGE]." PX 157 at 14. Clarence 13X disavowed violence, encouraged his community to pursue education, and worked closely with established political figures, including the former New York City mayor, John Lindsay. Id.[8] In a speech entitled "We are Not a Gang,"

---

[8] Clarence 13X is said to have walked arm-in-arm with Mayor Lindsay through Harlem after the assassination of Martin Luther King, Jr. and, although other cities "were devastated by riots,

delivered at Brookdale College in 1998, one NGE adherent explained that the group had been mislabeled as a gang because it consisted primarily of young men with checkered pasts who were just coming into knowledge of themselves. PX 43 at 13. He explained:

> We cannot be a gang, because we are a people who are civilized. . . . Every member of our Nation has a responsibility—has a duty—to teach those who are uncivilized; those who have no knowledge and wisdom of themselves, nor understanding of their culture, or respect for government. It is their duty to show these people how they must be. This is why we teach that we are not anti-white or anti-establishment. . . . The only initiation one must have is the true dedication to reforming one's self.

Id. at 14. Plaintiff testified credibly that in prison NGE adherents work with young men to help them break away from gangs. Tr. at 15:5-9. "I actually be around a lot of gang members," he said, "Bloods, Crips, you know, Gangster Disciples, MS-13, and a lot of them young guys, you know, and I get the opportunity to deal with them, to talk with them, you know, and try to move them away from their mindset." Id. at 14:18-25. Similarly, an issue of the Five Percenter newspaper advocates converting gang members, specifically Bloods, to become Gods, observing that "many a great God and Earth had gang origins [before] they got the knowledge. We must teach them!" PX 86 at 1.

### B. The VDOC's Policies Regarding Religious Activities

The VDOC regulates the recognition of religious groups in accordance with a policy entitled Offender Religious Programs. DX 28. Under this policy, offenders sign up to participate in religious services through a pass list, which is used to control access to communal worship. Id. at IV.A.2(b)(i). An offender who wishes to attend a religious service must fill out a form designating the service the offender wants to attend. Id. Inmates are generally not permitted to attend services for more than one religion. Id. All religious services are visually observed by

---

Lindsay praised Clarence 13X [] for helping to keep New York relatively free from damage." PX 157 at 8.

correctional officers, with the level of supervision varying based on the security level of the facility, and group worship is normally conducted by an approved external spiritual leader or volunteer, not an inmate. Id. at IV.A.7. Inmates may possess individual faith objects that have been approved by the Faith Review Committee, which is comprised of VDOC employees appointed by the Chief of Corrections Operations. Id. at IV.A.11; IV.D.1. All such objects must be purchased from the facility commissary and all religious literature must comply with the operating procedure for incoming publications. Id. at IV.F.6-7; see also DX 27. To request recognition for a religious group, an inmate must submit a "complete and well documented request" to the Facility Unit Head, who "will refer the request and supporting documentation to the Faith Review Committee for recommendation to the Chief of Corrections Operations," who makes the final determination whether to approve a proposed religious group. DX 28 at IV.E.3-4. Under the VDOC's policies, the Department may limit participation in religious activities based on "documentation showing a threat to the safety of persons involved in such activity or that the activity itself disrupts order in the facility." Id. at IV.F.1. In addition, "religious activities may be limited, restricted, discontinued, or denied by the Facility Unit Head based upon legitimate concerns regarding security, safety, facility order, space, or resources." Id.

Only those groups that are formally recognized by the Department are "allowed to meet in [VDOC] facilities." DX 28 at III, "Recognition of Religious Groups." The Department's policies require it to "give no preference to the activities of one religious denomination, faith, or sect over another." Id. at I. The list of "Religions Approved to Operate in [VDOC] Facilities" enumerates 39 "approved" religious groups. PX 114. Many of these groups are mainstream religions such as Islam, Judaism, and various Christian denominations. Id. Others are less widespread, such as Asatru, Eckankar, Integral Yoga, NOI, Santeria, and Wicca. Id. The list also

11

includes two "sects" that are "not approved": Five Percent Nation (Five Percenters/NGE) and Lost and Found Nation of Islam. Id. The Five Percenters/NGE has been designated a security threat group ("STG") or gang. PX 7 at 9.

In 2007, four inmates at Southampton Correctional Center petitioned the warden for recognition of the NGE and for the right to hold civilization classes. DX 9 at 00701. Warden J.V. Beale disapproved these requests and forwarded them to the then-Eastern Regional Director, A. David Robinson, who also disapproved the requests and forwarded them to the Faith Review Committee. Id. The Faith Review Committee referred them to J. Randy Myers, the Committee's religious adviser, who testified during the bench trial. Id. Myers is a Baptist minister with an undergraduate degree in religious studies and a Master of Divinity degree from Southeastern Baptist Theological Seminary. Tr. at 436:22-25. Unlike plaintiff's expert Professor Knight, Myers has not published any books about the NGE or conducted the same kind of fieldwork. Instead, he based his conclusions on review of a Wikipedia page, three websites, and two news articles, as well as consulting with a member of the VDOC Gang Unit. Id. at 00700-03. Using that information, Myers wrote a two and a half page report summarizing his understanding of NGE beliefs and recommending that based on the VDOC's classification of the NGE as an STG "and on the racist teachings of the group and the extensive record of dangerous, gang-related, violent acts committed by its adherents in prisons and society," the Committee should deny the request for recognition. Id. In support of his finding that the NGE was dangerous, Myers wrote, "Most state prison systems consider Five Percenters to be a gang or a security threat group, refusing to recognize them as a religion, refusing to allow adherents to congregate, and banning their publications." Id. at 007002.

In his testimony, Myers added that the NGE did not satisfy the four-factor test he used to assess a potential religion—although this test is not discussed in his recommendation to the Committee—and that "a real determining factor for [him] was in so much of what [he] found in the literature it refers to a deity or God of any sort as a mystery spook, as a human construct created by other world religions, be they Islam, Judaism, Christianity, whatever." Tr. at 445:11-446:22.[9] He also concluded that the NGE's beliefs were not pro-social. Id. at 448:18-449:1. Based on his limited research, Myers testified that "the focus of the Five Percenters is not actually on a Supreme Being or a higher power but on the preservation and glorification of one race over all others." Id. at 452:16-18. On October 31, 2007, after reviewing Myers's recommendation, the Faith Review Committee did not approve the petition, concluding that the NGE "is not a recognized religion in the VDOC." DX 9 at 00699. The Court finds that Myers's opinion about the NGE and his report to the Committee were not reliable because he based his conclusions on insufficient information.

Moreover, to the extent the Department was concerned about "the glorification of one race over all others," it has acted inconsistently by granting recognition to Asatru (also referred to as Odinism), a group associated with white supremacists, at the same meeting at which it denied recognition to the NGE. DX 9 at 00698. Asatru is "the ancestral folk religion of Northern Europe and a polytheistic, nature-based faith that worships a variety of gods and goddesses." Mayfield v. Texas Dep't of Criminal Justice, 529 F.3d 599, 602 (5th Cir. 2008). It is well documented that "Asatru has ties to white supremacist gangs in many prisons," Karow v. Fuchs, No. 16-3049, 2017 WL 2623106, at *2 (7th Cir. June 16, 2017), and it has been designated as a

---

[9] Myers does not know the origin of the four-factor test that he applied or whether it has a name. Tr. at 469:10-470:9. He simply inherited the test from his supervisor at the VDOC, who has no postgraduate training in religion. Id.

gang by the VDOC, PX 7 at 2; PX 29 at 31. Despite clear evidence of violence directly connected to religious activity—in 2000, two VDOC inmates who practiced Asatru had violently murdered another inmate with 68 stab wounds on an "altar" during an "Asatru ceremony," Lenz v. Commonwealth, 544 S.E.2d 299, 301-02 (Va. 2001)—Asatru was approved by the Faith Review Committee. DX 10 at 000710. Myers, who recognized that Asatru has a white supremacist element that teaches racial violence, supported this decision based on his conclusion that Asatru was "legitimate" because it "tries to preserve a pre-Christian religion in [its] deities" and has pro-social values of "family life, raising children, [and] being patriotic." Tr. at 449:9-451:10.

On July 7, 2011, the Faith Review Committee reviewed a second request to recognize the NGE. DX 10. The Faith Review Committee did not ask Myers to prepare a new report or update his old recommendation. In the absence of a request for additional work, Myers repeated his recommendation that the Committee disapprove recognition, which they did. Tr. at 457:20-458:7; DX 10 at 00710. As the Committee explained in its minutes, "This group is viewed as a gang, not a religion." DX 10 at 00710.

At the same meeting, the Committee considered whether to approve Asatru adherents possessing the Asatru Credo, a two-page document that was confiscated from an inmate based on "security concerns over the content." PX 83 at 7. Myers recommended that the Committee approve the document, observing that "[t]hese teachings are in line with mainstream Asatru/Odinism teachings, and this is a faith group that has been recognized by [the VDOC]." Id. He continued,

> The credo asserts racial separation (i.e. the "purity" of the races), not racial hatred or supremacy or violence. I see nothing in this credo that constitutes a security threat within [VDOC] facilities. (I would note that the teachings of the Nation of Islam—NOI—are more potentially volatile, with the emphasis on Caucasians as

14

the "white devils." I do not see anything that rises to that level in these statements.)

Id. The Committee ultimately took no action on the matter, finding that "[t]his item was not referred by any institution, nor was there a request to approve or disapproved [sic] this document." DX 10 at 00710.

While incarcerated at Greenville Correctional Center, plaintiff twice applied for recognition of NGE as a religion. PX 45A. There is no indication that either of these requests were ever forwarded to the Faith Review Committee, as required by Department policy. Id. Plaintiff also filed multiple administrative complaints challenging the confiscation of NGE literature from his mail. Id. at 31. These actions form the bases for his four RLUIPA claims. Although the VDOC previously raised failure to exhaust as an affirmative defense, at trial the Department conceded that plaintiff had fully exhausted his administrative remedies and the Court made a finding to that effect. Tr. at 28:17-20, 35:19-36:4.

The VDOC can and does use the controls established in its Offender Religious Program policy to limit religious privileges as necessary for security and orderly operations. According to Robinson, now the Chief of Corrections Operations, the Department has previously had security concerns with the NOI and its 3,000 adherents in VDOC facilities and it has been able to address those concerns by monitoring NOI activity through informants. Tr. at 508:1-21. When there is information about a potential threat to the security or operation of a facility, the Department restricts the frequency or duration of the NOI's meetings, subdivides adherents into smaller groups, and may even put the instigators into restrictive housing. Id. at 508:22-509:6. Robinson testified that during his thirty-five year career with the VDOC there have been some violent acts by NOI members but none "specifically related to that religion." Id. at 510:2-8.

15

Similarly, Burke, the Central Region Coordinator for what is effectively the Department's gang unit, testified that a large number of white supremacists attend Asatru meetings and "they are closely monitored, and . . . security staff is always present. There have been instances where that group has stepped out beyond what is the Asatru religion, and they have been suspended or even shut down at certain localities for abusing the religion itself to cover what they were doing." Id. at 429:22-430:6. But, despite the group's history of violent incidents within the VDOC, Asatru is still recognized as a religion because if a group is "recognized as a religion, [the Department] tend[s] to not track them and focus solely on them as much as [they] do the security groups." Id. at 428:4-7. (Burke was unaware that Asatru is also designated as a gang. Id. at 419:9-23.)

### C. The Nation's Designation as a Security Threat Group

For purposes of this litigation, the VDOC uses the terms "STG" and "gang" interchangeably. PX 155 at 3. It defines a gang as: "A group of individuals who: (a) possess common characteristics that distinguish them from other offenders or groups of offenders and who, as an entity, pose a threat to the safety and security of staff, the facility, other offenders, or the community; (b) have a common distinctive goal, symbolism, or philosophy; [and] (c) possess identifiable skills or resources or engage in unauthorized/illegal activities." DX 26 at 2.

In 1996, Gene Johnson, then the director of the VDOC, circulated a one-page memo advising regional directors and wardens that "'Five Percent' groups should not be allowed to meet in any Department of Corrections facility." DX 13. The memo did not identify any evidence of a security threat. Id. It simply observed that the Five Percent groups were "non-religious in nature, and that these groups consider their beliefs to be a 'way of life' rather than a religion." Id. It added, without explanation, that "these groups may attempt to meet covertly" and

16

that "some members may present a threat to the orderly and secure operation of the institution." Id.

At a June 2001 evidentiary hearing in a First Amendment case brought by an inmate challenging the Department's policies regarding the NGE, Director Johnson testified that the VDOC had not experienced any substantial problems with the NGE before the 1996 ban and that no security-related incidents had occurred since 1996 that reaffirmed the decision to ban the NGE. Pl. Findings [Dkt. No, 226] ¶ 17.[10] He stated that the memo and the ensuing ban on NGE activities was based in part on a 1995 phone call with the South Carolina Department of Corrections, id., which began advocating for other correctional institutions to ban the NGE after five inmates in a South Carolina correctional institution led an uprising in April 1995, PX 157 at 15. The inmates ultimately surrendered in exchange for five minutes of time with an Associated Press reporter to air their grievances about a new policy requiring that inmates be clean shaven and have short hair. Id. at 15-16. According to press reports, the inmates involved self-identified as Muslim or Rastafarian. Id. at 15. The subsequent criminal investigation concluded that one member of the uprising was a member of the NGE. Pl. Findings [Dkt. No, 226] ¶ 11. The South Carolina Department of Corrections responded to the incident by banning the NGE and placing all suspected members in administrative segregation. PX 157 at 16. At least one such adherent was held in "solitary confinement for 20 years, despite not having committed a single disciplinary infraction during that time." Incumma v. Stirling, 791 F.3d 517, 519 (4th Cir. 2015).

---

[10] The description of this testimony in Plaintiff's Proposed Findings of Fact [Dkt. No. 226] cites at length to a hearing transcript from Coward v. Angelone, No. 3:00-cv-240 (E.D. Va. Sept. 25, 2001). Due to the age of the file, the relevant transcript is not available electronically. Because defendants have not objected to plaintiff's characterization of the transcript, the Court will accept plaintiff's description of the transcript as accurate.

Johnson's 1996 memo merely precluded Five Percent groups from meeting and did not discuss any specific security issues associated with the NGE, but it was the basis for the NGE being designated an STG and since that time the Department has been "monitoring their activities and attempting to track their membership." PX 155; Tr. at 376:7-11, 388:3-5.[11] Although Burke, whom the Department designated as an expert in gang investigations, explained that "[a]ssessing each group, individually, prior to designating them as a STG minimizes—and in [his] assessment, eliminates—the risk that a relatively innocuous organization will be erroneously designated as an STG," PX 156 at 3, the Department offered no evidence of a comprehensive individual assessment being conducted of the NGE before imposing the STG designation.[12]

Under VDOC Operating Procedure 427.1, offenders are "prohibited from joining, recruiting, associating with, participating in, or acting in concert with any individual or group of individuals who may constitute a gang." DX 11 at 3. They are also "prohibited from owning, creating, possessing, or passing to other individuals any correspondence, documents, photographs, drawings, jewelry, symbols, or property of any type that contains or indicates gang identifiers, language, or information." Id. "Any behavior" that "indicates such participation may lead to disciplinary, administrative, and/or criminal action against" the offender. Id. In accordance with this policy, STG members are not permitted to meet with other members of the

---

[11] The NGE is not considered a criminal street gang in Virginia and its adherents are not monitored by law enforcement. Tr. at 432:23-25.

[12] In addition to the memo from Johnson, Burke also cites a 2013 affidavit from the manager of the VDOC's Gang and Security Threat Group Unit to justify the 1996 designation of the NGE as an STG. According to that affidavit, in the 1990s the Five Percenter group at Powhatan Correctional Center would "participate in exercise drills similar to military drills," "practice defensive tactics," alter their clothing to show unity among the group, employ a rank structure, and "pat down the attendees" before meetings. Allah v. Commonwealth, No. 2:12-cv-00033 [Dkt. No. 33-1] ¶ 9 (W.D. Va. 2013). The security threat posed by these activities is unclear.

group and they receive additional scrutiny from correctional officers. Tr. at 421:2-422:14. In addition, an STG designation may affect an inmate's eligibility for parole and precludes parolees from meeting with other members of the group or possessing the group's symbols or literature while on parole. Id.

Burke filed an expert report and offered testimony explaining why the Department considers the NGE to be an STG. A major factor in his analysis was the number of NGE adherents he believed to be in VDOC facilities. In his report, Burke, who like others in the Department uses the term "Five Percenters" to refer to NGE adherents, stated that "Five Percenters are the second-largest STG within the [Department]," PX 155 at 8, and claims that the VDOC's NGE adherent population "far eclipses the number of Five Percenters housed in correctional facilities in other states." Id. at 10. Burke testified that the Department identifies suspected gang members by assigning them points for "self-admission, for tattoos, for affiliation with other known members, possession of documents, things of that nature." Tr. at 371:18-24. Once an inmate either has ten points or self-identifies as a gang member, the inmate is considered a "known" or validated gang member. Id.

Burke's report identified "1200 [VDOC] offenders currently classified as either known or suspected Five Percenters" out of a total inmate population of 30,000, PX 155 at 10; however, during his testimony, Burke reduced that estimate of 1200 known or suspected NGE inmates by admitting that only about 700 were still "active" in the VDOC's data system. Tr. at 372:9-18. Moreover, of these 700, several hundred were on probation or parole, reducing the number of known or suspected NGE adherents actually being housed within VDOC correctional facilities to no more than the high 400s. Id. at 400:9-16. In addition, Burke did not and could not identify what subset of these inmates were validated NGE members. Based on these admissions, Burke

19

conceded that the percentage of Virginia's inmate population affiliated with the NGE is similar to that of New York, which has 724 NGE adherents (out of 53,000 offenders). Id. at 407:17-408:14.

The VDOC records also indicate that Five Percenters may be assigned more than one gang affiliation, with the Department designating inmates as either "Five Percenter," "Five Percenter/Blood," or "Five Percenter/Crip." PX 25 at 31; PX 149 at 2; DX 21 at 02268. The Five Percenters appears to be the only gang for which the VDOC lists cross-affiliations. PX 25 at 31.

Another factor Burke identified as supporting NGE's designation as an STG is five specific incidents of violence involving NGE adherents. PX 155. These incidents occurred over the twenty-one-year period from 1996 to 2017. Id. First, relying on an affidavit submitted in a previous lawsuit by then-Director Johnson, Burke's report stated that "Five Percenters assaulted a correctional officer at the Keen Mountain Correctional Center[, a level 4 facility,] in January 1996," PX 155 at 8; however, Director Johnson's original affidavit provided no additional details about the number of inmates involved, the inmates' motivation, or the nature of the assault, Johnson Aff. ¶ 4(f), Versatile v. Johnson, No. 3:09-cv-00120 (E.D. Va. 2010), ECF No. 27-1, and neither party has introduced the records documenting the incident.

Burke's report also relied on an affidavit from a previous lawsuit to assert that "at Red Onion State Prison, an offender kicked an officer in the chest, and, in his cell, documents were found indicating that the offender wanted to hurt staff members." PX 155 at 7. According to the disciplinary offense report, the event actually took place at Wallens Ridge State Prison, a level 5 facility,[13] where, on September 18, 2005, a correctional officer had just removed the leg shackles

---

[13] VDOC inmates are assigned to a facility with a security level that corresponds to their criminal offenses, the length of their sentence, and their history of disruptiveness. According to the Department's classification system, level 1 facilities are considered minimum custody and

from an inmate when the inmate kicked the correctional officer in the chest. PX 23 at 1. A subsequent search of the inmate's cell revealed Five Percenter lessons as well as Crip literature and a note saying "I'm trying not to let these devils trick me up but I hate these police. I want to do something dangerous to them." Id. There is no indication in the report that the officer was injured. Id. at 1-2. Because the disciplinary hearing determined that the assault could not be tied to STG activity, the inmate was found guilty of simple assault and possession of STG related materials. Id. at 1-4

The third incident identified in Burke's report occurred at Keen Mountain Correctional Center in March 2009 when an inmate described by Burke as a Five Percenter got into an argument with another inmate, described as Caucasian, and told him, "White people are the devil." PX 155 at 9. According to Burke, a few days after the argument, the Five Percenter assaulted the Caucasian inmate with his fists, resulting in the victim suffering multiple facial fractures. Id. During the bench trial, the only evidence the Department provided to corroborate Burke's description of the incident was the VDOC's eleven-page incident report, which makes no mention of the race of either of the inmates, includes no description of any words that were exchanged between them, and does not indicate that the assailant was a member of NGE or a Five Percenter. DX 20.

As to the fourth incident, Burke's report states that "a Five Percenter stabbed two Gangster Disciples at Sussex II state prison[, a Level 4 facility,] in approximately 2013." PX 155 at 9. The contemporaneous documentation from the Department indicates that inmate Pridgen, "a

---

inmates go to work in their communities every day; level 2 facilities are dorm facilities where offenders are housed in open dormitory environments; level 3 facilities are medium security cell blocks; and level 4 and level 5 facilities are considered high security facilities which, among other restrictions, limit the number of people who can come together in a given area to no more than 128 inmates at a level 4 facility and 88 at a level 5 facility. Tr. at 517:4-20.

confirmed Five Percenter/Blood," was involved in a fight with a member of the Gangster Disciple from his housing unit in May 2013. PX 149 at 2; DX 21 at 02268. The Gangster Disciple was punished and transferred to a different housing unit. Id. On July 9, 2013, a fight broke out between Pridgen and two different Gangster Disciples in which Pridgen stabbed one of his assailants. Id. Prison officials concluded, "This incident appears to be a retaliation from the Gangster Disciples against [Pridgen] based on the previous [housing] incident." Id.; DX 21 at 02234.

As a final example of the "serious incidents" involving the NGE, Burke's report pointed to an April 2, 2015 assault in which "two known members of the Five Percenters attacked another inmate (unaffiliated with any STG) with homemade metal shanks." PX 155 at 8. According to the VDOC's Report of Investigation, the fight, which took place at August Correctional Center, a level 3 facility, involved four African American inmates, Allah, Howard, Fentress, and Young, the first three of whom were designated as "members of the Five Percenter gang." PX 116 at 1, 3. Allah and Howard attacked Young with sharpened pieces of metal and then Fentress joined the fight alongside Young, his cellmate. PX 112 at 1. Fentress hit Allah who then struck Fentress with a sharpened piece of metal. Id. at 2. Prison officials broke up the fight and separated the inmates. While Howard was being escorted to segregated housing, he yelled "pride walk." Id. Young sustained several puncture wounds that were three millimeters deep but none of the inmates required outside medical treatment. PX 116 at 10. When officers asked one of the inmates about the cause of the fight, "he said he couldn't say what [it] was about" and when he was asked if it was an altercation between the Bloods and the Five Percenters, the inmate said "he wouldn't refute that either." PX 109 at 8. The 72-page report offers no conclusions or theories about what caused the fight. PX 116.

22

Burke's report also identified "disruptive" activity by NGE adherents, including officers at Greenville Correctional Center, a level 3 facility, performing "two cell extractions of Five Percenters for disruptive behavior in the segregation unit," and "a group of Five Percenters, along with some identified Bloods, [taking] over the Rastafarian religious services at Sussex II State Prison, using those services as cover for conducting group meetings." PX 155 at 8-9. According to the corresponding documentation, a letter from a correctional officer at Sussex II state prison to the warden, the inmates attending the Rastafarian Program meetings were "not participating in religious activities when they [were] meeting in the dining hall" but were discussing the date, July 9, 2007. PX 28 at 1. The officer expressed concern that one inmate was overheard saying that "the 797 [i.e., 07-09-07] is going down like the 747" while others remarked on the "unfair treatment that they were receiving within the institution" and talked about assigning security positions within the facility. Id. The memo also stated that of the 65 inmates enrolled to attend the program, 30 inmates had been validated as gang members with most being designated as Five Percenters and Bloods. Id.

Burke's report also cited evidence of NGE adherents attempting to "recruit other inmates to join the Five Percenters." PX 155 at 9. For example, on January 6, 2010, a gang specialist at Powhatan Correctional Center, a level 3 facility, documented an interview he had with an inmate found in possession of "several pages of 5% knowledge," consisting of a homemade newsletter (The Enlightener Newsletter), which the inmate admitted was prepared by an inmate at Powhatan. PX 53 at 1. The inmate also admitted to participating in monthly "Ciphers (meetings)" where the newsletters were distributed. Id.

To buttress his conclusion that the NGE is a gang, Burke's report referenced an open letter from the national chairman of the New Black Panther Party for Self Defense ("the Party"),

23

which advocated for "unity between The New Black Panther Party and the progressive members of the Bloods who desire a better life for our people" and stated that the Party's "unity efforts to date include unity with the Nation [of] Islam (NOI) and Minister Louis Farrakhan; 5% Nation of Gods and Earths; (NGE): Lost and Found Nation [of] Islam (LFNOI); . . . various Islamic and Muslim formations; Moorish Science Temple of America (MSTA); the Black Hebrew Israelites;" and several other entities. PX 26 at 1-3. Although the NOI, the Moorish Science Temple of America, and the African (Black) Hebrew Israelites are all religions approved by the VDOC, PX 114 at 1, the Department characterizes the letter as "acknowledg[ing] that the Five Percenters were also a gang and ask[ing] them to join their organization." PX 155 at 10.

Burke's report stated that the NGE's designation as an STG is further supported "by the message of racial supremacy that is displayed in their literature and teachings" and that "the literature or lessons utilized by this group, if viewed by other white members of the offender population, or even staff, could generate a risk to the harmonious operation of [VDOC's] facilities." Id. at 13. When Burke was asked at trial why the Department does not monitor the NOI, which shares much of the same rhetoric and foundational texts with the NGE, Burke's only explanation was that "one is looked at as a recognized religion and the other is recognized as a gang." Tr. at 429:1-2. Burke agreed that the Department regards incidents involving the NGE as gang activity because that group is classified as a gang, while the same conduct, if done by a member of the NOI, would not be considered gang activity. Id. at 429:3-14. When addressing why racially supremacist teachings by Asatru do not undermine prison security, Burke explained that the VDOC doesn't "recognize [Asatru] as a gang because they're recognized as a religion." Tr. at 419:9-13. (As Burke ultimately acknowledged, according to the VDOC's records, Asatru is both an approved religion and a designated gang. Id. at 419:14-23.)

24

Burke's report emphasized that the list of violent and disruptive incidents was not exhaustive and that there have been 503 total incident reports "involving Five Percenters in VDOC facilities since 2011," PX 155 at 10; however, the Department offered no details about these incidents other than Burke's representation that "they encompass multiple aggravated assaults, serious assaults, cell extractions, fights, situations requiring use of force and/or application of restraints, [and] possession of contraband." PX 155 at 10. But, Horn, who reviewed the list of incident reports, testified that many were unrelated to gangs or violence, such as medical emergencies and attempts to destroy state property, which could include anything from cutting prison pants short to writing on the wall of a cell. Tr. at 296:2-7.

### D. Accommodations for the NGE

In response to this lawsuit the VDOC conducted a survey of correctional institutions across the country, asking about their policies regarding the NGE. The survey was distributed on the VDOC's behalf by the Association of State Correctional Administrators ("ASCA")[14] and thirty-three states responded. According to the survey responses, the correctional departments of thirteen states with NGE adherents do not recognize the NGE as a religion. They include Arkansas, Delaware, Georgia, Kentucky, Minnesota, Nevada, New Hampshire, North Carolina, South Carolina, Tennessee, Texas, Washington, and West Virginia. PX 136 at 5-7.[15] By comparison, fifteen states' correctional departments do recognize the NGE as a religion. States that have voluntarily afforded recognition to the NGE include Alabama, Illinois, Indiana,

---

[14] ASCA is a professional organization representing the interests of the directors of corrections of the 50 states, the territories of the United States, and several large municipalities as well as the Bureau of Prisons. Tr. at 300:13-22.

[15] At the time of the survey, Rhode Island was among the states that did not recognize the NGE. It has since reached a settlement agreement pursuant to which it "acknowledges that [the NGE] is a religion and shall be accorded the same protections as any other religion." PX 152 at 4.

Maryland, Montana, Ohio, and Pennsylvania. Pl. Findings [Dkt. No. 226] ¶ 58. In addition, the NGE has obtained recognition as a religion in lawsuits filed in Connecticut, Iowa, Massachusetts, Michigan, New Jersey, New York, Oklahoma, and Rhode Island. PX 122A; PX 122B; PX 122F; PX 122G; PX 122I; PX 122K; PX 122M; PX 152. Of particular significance to this litigation, Massachusetts agreed to recognize the NGE in 2008 while defendant Clarke was the Commissioner of the Massachusetts Department of Corrections. Tr. at 144:4-7.

Although there is some variation in the privileges afforded to NGE adherents, most states that have recognized the NGE permit adherents to have access to their foundational texts, including the 120 Degrees, the Supreme Mathematics, and the Supreme Alphabets, PX 122F at 3; PX 101 at 27; permit observance of the NGE's four honor days, PX 101 at 27; PX 152 at 4; authorize adherents to elect an alternative diet consistent with their religious beliefs, PX 122N at 1; PX 152 at 4; and allow corporate worship to the extent that NGE adherents can identify an outside volunteer faith representative, PX 122N at 1; PX 122M at 1-2.

Of great significance to this litigation is the VDOC's failure to provide any evidence of increased violence or erosion of good order and discipline at any correctional facility following recognition of the NGE. To the contrary, defendant Clarke testified that he was not aware of any discipline problems with the NGE during the three years he headed the Massachusetts Department of Corrections after the NGE was recognized as a religion. Tr. at 146:3-7. He also testified that he is in contact with his counterparts at other correctional facilities and is not aware of any problems with the NGE in the states that have recognized it as a religion. Id. at 188:20-189:4.

Although Burke believes that "allowing the Five Percenters to meet, organize, or possess their literature would pose an unacceptable risk to the safety and security of VDOC institutions,"

26

PX 155 at 14, Clarke testified that based on what he had learned during the course of this lawsuit, the total ban on the NGE should be changed and he acknowledged that there are less restrictive means of achieving the Department's goals. Tr. at 149:19-24, 209:11-18.

Shortly before trial, the Department offered an accommodation that would entail moving NGE adherents who want to practice their beliefs to a designated housing unit at Wallens Ridge State Prison, a level 5 facility, where the group would retain its STG designation but members would be allowed to practice their beliefs and possess their literature. Tr. at 539:13-20. (Wallens Ridge is an all-male facility; female adherents would be placed at Fluvanna, a level 3 facility. Id. at 176:10-16.)[16] This accommodation would be subject to review and reconsideration after one year. Id. at 162:10-14. Plaintiff is currently incarcerated at Deep Meadow Correctional Center, a level 2 facility. Id. at 54:2-6. He has declined this accommodation stating, "To do that is to say something is wrong with the [NGE]. To do that is to say that, they still say that we are a gang or we're STG. To separate [NGE adherents] and give [them] privileges over here while everybody else got privileges everywhere else is not right." Id. at 56:18-57:2.

III.    CONCLUSIONS OF LAW

### A. **RLUIPA (Claims 1-4)**

#### 1. Section 3 of RLUIPA

RLUIPA requires that burdens on the free exercise rights of incarcerated persons must withstand strict scrutiny, the most stringent standard of judicial review. Madison v. Riter, 355 F.3d 310, 314 (4th Cir. 2003). Recognizing that inmates are subject to "a degree of

---

[16] The Department has implemented a similar accommodation for Rastafarians who wish to have long hair in accordance with their religious beliefs. Tr. at 546:17-25. The Department considers long hair a security risk and it is not allowed in general population. Id. The Department has created an exception for Rastafarians who wish to grow their hair long as part of their religious beliefs, permitting them to do so if they agree to be transferred to a designated housing unit at  .
Wallens Ridge where the Department has "more control" and "more observation." Id.

[governmental] control unparalleled in civilian society and severely disabling to private religious exercise," Cutter v. Wilkinson, 544 U.S. 709, 720-21 (2005), Congress "passed RLUIPA to afford this confined population greater protection of religious exercise than what the Constitution itself affords," Lovelace v. Lee, 472 F.3d 174, 186 (4th Cir. 2006).

Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the government demonstrates that the burden is "in furtherance of a compelling governmental interest" and is "the least restrictive means of furthering that . . . interest." RLUIPA, § 3(a), 42 U.S.C. § 2000cc–1(a).[17] A plaintiff "shall bear the burden of persuasion" on the prima facie case, namely "whether [the challenged practice or law] substantially burdens the plaintiff's exercise of religion." Id. § 2000cc–2(b). If a plaintiff establishes a prima facie case, the burden shifts to the government to prove that the burden in question is the least restrictive means of furthering a compelling governmental interest. Id. § 2000cc–1(a).

Determination of what constitutes a "religious" exercise is, as the Supreme Court has acknowledged, "a most delicate question," Wisconsin v. Yoder, 406 U.S. 205, 215–16 (1972), and one that is "of course a difficult question for courts of law to decide," Doswell v. Smith, 139 F.3d 888 (table), 1998 WL 110161, at *3 (4th Cir. 1998). "But the inquiry, however difficult, is necessary, for while 'the very concept of ordered liberty precludes allowing every person to make his own standards on matters of conduct in which society as a whole has important

---

[17] Section 3 applies to programs or activities that receive federal financial assistance, 42 U.S.C. § 2000cc–1(b)(1), which the VDOC does, Lovelace, 472 F.3d at 186.

interests,' the Free Exercise Clause protects those beliefs that are 'religious' and sincerely held." Doswell, at *3 (quoting Yoder, 406 U.S. at 215-16).

The test for determining whether an inmate's beliefs are protected as a religion is "whether they are (1) sincerely held and (2) religious in nature under [the inmate's] 'scheme of things.'" Moore-King v. County of Chesterfield, 708 F.3d 560, 570-71 (4th Cir. 2013) (quoting United States v. Seeger, 380 U.S. 163, 185 (1965)).[18] In determining whether the belief is religious in nature, a court should consider whether the belief "occup[ies] a place in [the inmate's] life parallel to that filled by the orthodox belief in God." Id. at 571 (internal quotation marks omitted).[19]

A system of religious beliefs "is distinct from a 'way of life,' even if that way of life is inspired by philosophical beliefs or other secular concerns;" however, "[a] religion need not be based on a belief in the existence of a supreme being (or beings, for polytheistic faiths)." Kaufman v. McCaughtry, 419 F.3d 678, 681 (7th Cir. 2005) (citing Yoder, 406 U.S. at 215-16).[20] As the Supreme Court has recognized, there are many religions in this country that "do not teach

---

[18] The second prong of this inquiry appears to be both subjective and objective. It is subjective insofar as it looks at the role a belief system plays "in the life of its possessor," Seeger, 380 U.S. at 166, and objective insofar as determining what is "religious in nature" depends on "objective criter[ia]," Dettmer, 799 F.2d at 932, 931 (quoting Seeger, 380 U.S. at 166) because the "concept of ordered liberty precludes" subjective standards, Yoder, 406 U.S. at 215-16.

[19] The Court is aware that other district courts in this circuit have applied tests from Africa v. Pennsylvania, 662 F.2d 1025, 1032-33 (3d Cir. 1981), and United States v. Meyers, 95 F.3d 1475, 1483 (10th Cir. 1996), to determine whether a belief system constitutes a religion, see, e.g., Versatile v. Johnson, No. 3:09-cv-120, 2011 WL 5119259, at *5 (E.D. Va. Oct. 27, 2011), aff'd, 474 F. App'x 385 (4th Cir. 2012); Harrison v. Watts, No. 1:06-cv-1061 (E.D. Va. Mar. 28, 2008); however, because the Fourth Circuit relied on the Moore-King test in Coward v. Jabe, No. 13-6-60, at *5 (4th Cir. July 5, 2013), it is the law of the case and the Court will apply it here.

[20] Applying this test, the Eleventh Circuit has held that for purposes of the First Amendment, atheism—a "school of thought that takes a position on religion, the existence and importance of a supreme being, and a code of ethics"—qualifies as a "religion." Kaufman, 419 F.3d at 682.

what would generally be considered a belief in the existence of God," including "Buddhism, Taoism, Ethical Culture, Secular Humanism and others." Torcaso v. Watkins, 367 U.S. 488, 495 n.11 (1961). Courts must also "take care to 'avoid any predisposition toward conventional religions so that unfamiliar faiths are not branded mere secular beliefs.'" Doswell, at *3 (quoting Africa, 662 F.2d at 1031). Similarly, adherents "may not be put to the proof of their religious doctrines or beliefs. Religious experiences which are as real as life to some may be incomprehensible to others." United States v. Ballard, 322 U.S. 78, 86 (1944).

RLUIPA "define[s] 'religious exercise' capaciously to include 'any exercise of religion, whether or not compelled by, or central to, a system of religious belief,'" Holt v. Hobbs, 135 S. Ct. 853, 860 (2015) (quoting 42 U.S.C. § 2000cc–5(7)(A)), and Congress has mandated that RLUIPA be construed "in favor of broad protection of religious exercise, to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc–3(g). Courts have interpreted this language as indicating that Congress "intended to provide as much protection as possible to prisoners' religious rights" without overly encumbering prison operations. Murphy v. Mo. Dep't of Corr., 372 F.3d 979, 987 (8th Cir. 2004). Congress has also recognized that RLUIPA "may require a government to incur expenses in its own operations to avoid imposing a substantial burden on religious exercise." § 2000cc–3(c).

2. The VDOC's Designation of the NGE as an STG and Refusal of Recognition

Numerous courts in the Fourth Circuit have addressed RLUIPA claims by NGE adherents and found that the NGE is not a religion and/or that the VDOC's policies toward the NGE represent the least restrictive means for addressing a compelling government interest. See, e.g., Allah v. Virginia, No. 2:12-cv33, 2014 WL 1669331, at *1 (W.D. Va. Apr. 28, 2014), aff'd, 601 F. App'x 201 (4th Cir. 2015), Versatile, 2011 WL 5119259; Harrison, No. 1:06-cv-1061.

Nevertheless, cases must be decided on the record presented by the parties and, on this record, the Court finds that plaintiff has carried his burden of proving that the NGE is a religion and that his belief is substantially burdened by the Department's policies. The VDOC, in turn, has failed to demonstrate that its designation of the NGE as an STG, and by extension its zero tolerance policy for NGE activity, represents the least restrictive means of furthering a compelling government interest.

### a. Prima Facie Case

The threshold question before this Court is whether plaintiff's beliefs are entitled to protection as a religion, that is, whether they are 1) sincerely held and 2) religious in nature under Coward's scheme of things. Moore-King, 708 F.3d at 570-71. The Department does not challenge the sincerity of plaintiff's beliefs and, based on plaintiff's testimony and demonstrated expertise about the Nation, the Court finds that his beliefs are sincerely held.

The Department does dispute that the NGE is a religion, arguing that its adherents "worship themselves, rather than a higher being or power," and "are not engaged in a religious practice, as contemplated under RLUIPA." Def. Findings [Dkt. No. 225] at 16. The facts in this record do not support that position. The evidence before the Court, as discussed supra, amply demonstrates that the NGE's belief system occupies a place in Coward's life parallel to that filled by the orthodox belief in the god of Christianity, Judaism, or Islam. Moore-King, 708 F.3d at 571. That NGE adherents do not believe in a deity does not disqualify the group from RLUIPA protection, as many widely recognized religions, such as Buddhism, "do not teach what would generally be considered a belief in the existence of God." Torcaso v. Watkins, 367 U.S. 488, 495 n.11 (1961); PX 137 at 12. Similarly, NGE adherents' opposition to the label "religion" is not dispositive because neither the Free Exercise Clause nor RLUIPA "turn on mere semantic

31

distinctions." Marria v. Broaddus, No. 97 CIV.8297, 2003 WL 21782633, at *11 (S.D.N.Y. July 31, 2003); see also PX 157 at 12 (explaining that Japanese religions are no less worthy of the term simply because "the word 'religion' did not exist in Japanese until Western influences imposed the construct"). Rather, courts look to the belief system itself and here the evidence demonstrates that NGE beliefs fulfill a function in the lives of its adherents analogous to that of orthodox religions. According to plaintiff's religious expert Professor Knight, who has written two books on the NGE and was highly credible,

> [The Nation] makes a claim to a transcendent reality, that is, the divinity of the black man. [NGE adherents] have resources such as the Supreme Wisdom Lessons, Supreme Mathematics, and Supreme Alphabet[s], for understanding and interpreting that transcendent truth or that reality. They have practices such as fasting or dietary restrictions that reflect an effort to apply that transcendent reality and the texts to their lives, and there's a community that defines itself by this shared adherence to these transcendent truths and resources and practices.

Tr. at 243:12-244:2; see also Knight Rep, PX 157 at 12 (opining that "the Nation is every bit as much of a religion as Christianity, Judaism, Hinduism, and other forms of Islam" and representing that "this view of the Nation is shared by most scholars in the academic study of religion"). Accordingly, the Court finds that, under plaintiff's scheme of things, his beliefs are sufficiently religious in nature to be entitled to protection under both RLUIPA and the Free Exercise Clause.

The record is equally clear that the VDOC's policies impose a substantial burden on plaintiff's religious exercise. Defendants do not seriously dispute this. Def. Findings [Dkt. No. 225] at 16-18; Tr. at 587:6-24. As previously discussed, under VDOC Operating Procedure 427.1, NGE adherents are "prohibited from" and may be disciplined or criminally prosecuted for "joining, recruiting, associating with, participating in, or acting in concert with any individual or group of individuals" who share their beliefs and for "owning, creating, possessing, or passing to

32

other individuals any correspondence, documents, photographs, drawings, jewelry, symbols, or property of any type that" reference the NGE's beliefs or its Universal Flag. DX 11 at 3.

A substantial burden exists "[w]here the state . . . denies [an important benefit] because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs. While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial." Thomas v. Review Bd. of the Ind. Emp't Sec. Div., 450 U.S. 707, 717-18 (1981). The Supreme Court has recognized that "exercise of religion" involves "assembling with others for a worship service," Cutter, 544 U.S. at 720, and "refusal to allow group worship clearly places a substantial burden on [an inmate's] free exercise," Wright v. Fayram, No. C11-0001, 2012 WL 2312076, at *13 (N.D. Iowa June 18, 2012), report and recommendation adopted, No. C11-1, 2012 WL 2838366 (N.D. Iowa July 10, 2012). Similarly, precluding an inmate from participating in holy day observances "qualifies as a substantial burden under RLUIPA." Lovelace, 472 F.3d at 187. Just this year, the Fourth Circuit held that depriving an inmate of a foundational religious text "for longer than a period of 24 hours" imposes a substantial burden. Blankenship v. Setzer, 681 F. App'x 274, 277 (4th Cir. 2017). By designating the NGE as an STG and refusing to recognize it as a religion, thereby precluding plaintiff from engaging in communal assembly, observing the NGE's four honor days, and possessing his foundational texts, the Department has substantially burdened plaintiff's religious exercise.

### b. Government's Burden

Because plaintiff established a prima facie case, the burden shifted to the Department to show that designation of the NGE as a gang subject to a zero tolerance policy is 1) in furtherance of a compelling government interest and 2) the least restrictive means of furthering that

compelling government interest. Id. § 2000cc–1(a). The Court respects the expertise of "[p]rison officials [as] experts in running prisons and evaluating the effects of altering prison rules," but RLUIPA does not permit "unquestioning deference;" rather courts must hold prison officials to RLUIPA's "rigorous standard." Holt v. Hobbs, 135 S. Ct. 853, 864 (2015). The Department's asserted interest is "[m]aintaining prison order and institutional security—specifically, suppressing the growth of a violent racial supremacist security threat group." Def. Findings [Dkt. No. 225] at 17. Although prison order and security are compelling interests, the Court must determine whether those interests would be "seriously compromised" by accommodating plaintiff's religious exercise. Holt, 135 S. Ct. at 863. In other words, the Department must show that it has a compelling interest in preventing Coward from practicing his system of beliefs.

There is no evidence in this record that plaintiff is violent, a racial supremacist, or a threat to prison order and institutional security. In fact, his current incarceration at a level 2 facility undercuts any argument that he poses a threat to prison security. The Department attempted to introduce evidence of plaintiff's proclivity for violence by pointing to a recent scuffle he had with another inmate in the commissary line. Tr. at 41:19-24. As the Court observed from the bench, there was no evidence that the fight was motivated by race or religion. Id. at 42:1-43:14. Further, that incident provided no more basis to conclude that plaintiff is part of a violent gang than there is to argue that Christianity is a violent gang because Christians sometimes get into fights. Id.

Similarly, there is insufficient evidence in this record to conclude that the NGE is a violent, racially supremacist gang. Although Burke acknowledged that it was critical to conduct an individualized assessment of each group before designating it an STG to avoid an erroneous designation, PX 155 at 3, there is no evidence that such an assessment has ever been conducted

regarding the NGE. Rather, according to the record in this case, based largely on one disruptive incident in a South Carolina prison over twenty years ago, then-Director Johnson instructed that Five Percent groups not be allowed to meet in VDOC facilities. PX 16. This became the basis for an STG designation, subjecting NGE adherents to heightened scrutiny and monitoring, and under the Department's circular logic, all subsequent incidents involving Five Percenters—whether a fist fight among inmates or the distribution of NGE literature—then became evidence of "gang activity." After twenty-one years of tracking Five Percenters, the VDOC has not produced sufficient evidence supporting its position that the gang designation is warranted and furthers a compelling state interest.

For example, one of the Department's central arguments is that Virginia has a substantially larger NGE population than states that have recognized the group as a religion. This argument was significantly undercut by Burke's concession that the actual number of NGE adherents incarcerated in VDOC facilities is not 1200 but closer to the high 400s. Beyond the Department's initial error regarding the number of NGE adherents currently incarcerated, there are reasons to question whether even the lower number is accurate. Although the VDOC assumes that all "Five Percenters" are adherents of the NGE, Professor Knight testified that both NOI and NGE adherents refer to themselves as Five Percenters, raising questions about the accuracy of the Department's designation of individual inmates or at least its assumption that the NGE is synonymous with Five Percenters. In addition, the Department's representation that members of the Five Percenters "gang" cross-affiliate with other gangs is not credible because the two gangs with which they supposedly cross-affiliate—the Bloods and the Crips—are staunch rivals and the representation directly conflicts with the wealth of evidence from NGE literature and the more credible testimony of NGE adherents that one of the NGE's goals is to reform young men caught

up in gangs. PX 43 at 13; PX 86 at 1; PX 157 at 14; Tr. at 14:18-25, 15:5-9. The potential inaccuracies in the Department's designation of individual inmates are not merely a problem for assessing the size of the VDOC's NGE population; they undercut all of the Department's evidence about incidents involving Five Percenters by raising questions about whether these inmates are, in fact, NGE adherents.

Even if the Court were to accept the reduced number of NGE adherents as accurate, the evidence before the Court does not persuasively demonstrate that these inmates pose a collective security threat. As an initial matter, there is no reason to believe that an inmate who has been labeled a Five Percenter has a history of violent activity because the mere possession of NGE literature, which the Department regards as gang paraphernalia, is enough to result in an inmate being designated a suspected Five Percenter. In addition, although Burke represented that there were 503 incident reports involving Five Percenters in VDOC facilities since 2011, Burke was unable to testify about what percentage of the incidents were violent. Indeed, the Department provided no context for this statistic. For example, it offered no evidence about the total number of incident reports at the VDOC against which these 503 reports could be evaluated; what percentage of the incidents were related to NGE beliefs or practices; what percentage of these incidents were by suspected Five Percenters adherents versus known Five Percenters adherents; what percentage of the incidents were by "Five Percenters" as compared to adherents who were cross-affiliated as "Five Percenters/Bloods" or "Five Percenters/Crips;" or how this number of incidents compared to incidents involving members of other STGs, such as the Bloods and Crips, or to other religions, such as Asatru, the NOI, or Christianity. Without context, this data provides little support for designating the NGE as a gang to further a compelling state interest.

The Department has identified five individual incidents of violence involving Five Percenters in the twenty-one-year period from 1996 to 2017; however, it presented no records of the first alleged incident in 1996 and for the three most recent incidents, which occurred in 2009, 2013, and 2015, there is no evidence in this record linking the incidents to NGE's beliefs and practices. The one incident with any documented connection to the NGE occurred twelve years ago in 2005 when an inmate kicked an officer in the chest and a subsequent search of his cell revealed a note purportedly referring to correctional officers as "devils." PX 23 at 1. And yet, the Department's own investigation concluded that the assault could not be tied to STG activity. Id. at 2. In short, neither the 2005 incident nor the five incidents taken together is enough to support the designation of the NGE as an STG.

This conclusion is consistent with the opinion of plaintiff's expert on prison security, Martin Horn, who served as the Secretary of Corrections for the State of Pennsylvania for a period of six years and Commissioner of the City of New York's Department of Corrections for six years. Tr. at 274:19-22.[21] The Court found Horn's testimony to be highly persuasive. After reviewing Burke's report, Horn testified that he "did not see any body of evidence to suggest that [the NGE] was a cohesive organization that was routinely engaged in activities that were designed to disrupt the safe and orderly operation of prisons." Id. at 276:17-20. Horn observed that the VDOC consistently failed to identify a nexus between an inmate's belief system and his behaviors, id. at 278:17-24, and concluded that the incidents identified by the VDOC do not justify classifying the NGE as a gang because "they span a period of some ten years at least," "[t]hey are substantially separated in time and space," "[t]hey occur at different facilities," and "there's no indication that any of [the individuals] were motivated by their religious beliefs" or

_____

[21] Both of these states' departments of correction currently recognize the NGE as a religion.

"that they even knew each other," id. at 294:5-18. For example, when evaluating the evidence of the 2015 fight at Augusta, Horn observed that there was nothing in the record to suggest that the fight was motivated by religious beliefs, rather, "it's the kind of incident that occurs in a prison, it occurs among inmates of Christian faith and Islamic faith, and it doesn't prove anything other than inmates fight and inmates assault each other, and inmates defend their friends." Id. at 292:22-293:21.

Moreover, the Department has introduced insufficient evidence to support its assertion that the NGE's teachings are any more racist or violent than that of other groups such as the NOI and Asatru, which have been recognized as religions. The references to violence and "white devils" on which the VDOC relies are in a text that is foundational to the NOI, which has been recognized as a religion by the Department for approximately thirty years. Tr. at 510:9-15. As Professor Knight persuasively argued, these statements must "be understood in the context of the Nation's tradition as a whole" and that "reliance on isolated statements from Nation texts to characterize the Nation as a violent group is no more justified than relying on Psalm 137 to conclude that the Bible promotes infanticide." Id. (Psalm 137 states "Daughter Babylon, doomed to destruction, happy is the one who repays you according to what you have done to us. Happy is the one who seizes your infants and dashes them against the rocks."). Plaintiff's witnesses made it clear that a devil merely represents negative traits, which can be embodied by persons of any race. And, none of the Nation-specific texts—the 12 Jewels, the Supreme Mathematics, or the Supreme Alphabets—contains any discussion of violence or racial supremacy. Moreover, plaintiff presented evidence indicating that the NGE not only renounces gang activity, it works to reform young men who are caught up in gangs by teaching them self-mastery and positive values. The Department offered no expert or other evidence to contradict that evidence.

38

Even if the Department could show that designating the NGE as a gang subject to a zero tolerance policy serves a compelling interest, it cannot demonstrate that its policies are the least restrictive means of furthering that interest, a fact that Director Clarke explicitly conceded. Tr. at 149:19-24, 209:11-18. "The least-restrictive-means standard is exceptionally demanding," and it requires the Department to show "that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion." Burwell v. Hobby Lobby Stores, Inc., 134 S. Ct. 2751, 2780 (2014). As the term suggests, a zero tolerance policy is by definition a maximally restrictive, minimally tolerant policy. In practice, it means that NGE adherents may not associate with any individuals who share their beliefs or possess any property related to the NGE.

The Department argues that these policies are necessary because NGE literature is "a recruitment tool," the racial references in the 120 Degrees could cause tension among offenders of different races, as well as with prison staff, Tr. at 362:24-363:6, 365:4-17, and the Supreme Mathematics and Supreme Alphabet[s] could be used as a code to secretly communicate within the prison, Def. Findings [Dkt. No. 225] at 6. Based on these concerns, the Department argues that NGE adherents cannot even be permitted to possess NGE literature in the confines of their cell because "it could very easily be disseminated and passed on and copied and handed to other offenders." Tr. at 365:22-25. They also maintain that NGE literature could not be held exclusively with the chaplain or in the prison library because the NGE is "still recognized as a gang in the department, and that would be the same as saying, well, the Bloods can possess their literature and hold it in a certain location." Id. at 366:6-16. Similarly, the Department argues that NGE adherents cannot be allowed to meet because "it's a show of force amongst them to the rest of the population," which is a form of "intimidation;" "[i]t's a threat to security to have them all

39

in one location that way;" "[i]t's a tool for them to allow to recruit;" and "it gives them control . . . inside the facility walls." Id. at 362:8-18.

These arguments are not supported by the record before this Court. As an initial matter, the means the Department is using to advance its interests in prison order and institutional security are substantially underinclusive. With respect to the 120 Degrees, which is also central to NOI beliefs, there is no evidence that NOI adherents are prohibited from possessing it, either inside or outside their cells. Similarly, despite instances of white-supremacist Asatru literature being seized based on "security concerns over the content," PX 83 at 7, Asatru remains a recognized religion with the right for adherents to possess their foundational texts. And, there is no credible evidence that either the Supreme Mathematics or the Supreme Alphabets can be used to send coded messages that would incite disorder. These materials "have remained unchanged since the 1960s, and are widely available to law enforcement on the Internet and elsewhere." PX 157 at 18.

The Department's rationales regarding communal assembly are also inconsistent with how the VDOC has treated other similar groups. Specifically, although the Department claims to have security concerns regarding NOI meetings, it has neither withdrawn its recognition of the NOI as a religion nor designated it an STG, and it has permitted Asatru adherents to meet despite that group's gang designation, PX 7 at 2; PX 29 at 31, the violent murder that took place during an Asatru ceremony in 2000, Lenz, 544 S.E.2d at 301-02, and the VDOC's admission that it has "a large number of white supremacists that attend [Asatru] meetings," Tr. at 429:24-430:1. The Department has offered no plausible reason for treating NGE adherents differently, other than that Asatru is recognized as a religion while the NGE is not. In short, the VDOC's accommodation of the NOI and Asatru adherents is compelling evidence that its "interests could

40

be achieved by narrower [policies] that burdened religion to a far lesser degree." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 543, 546 (1993).

The availability of less restrictive means is reinforced by reference to the policies employed in other states. Correctional departments in fifteen states recognize the NGE as a religion and most of these departments appear to permit members to possess their foundational texts and engage in some form of communal worship. For example, pursuant to the policies implemented by the Massachusetts Department of Corrections while Director Clarke was commissioner, NGE adherents were permitted to celebrate four holy/honor days, engage in private prayer or acknowledgment throughout the day, participate in one-on-one meetings with approved external NGE volunteers, and possess the 120 Degrees, the Supreme Mathematics, the Supreme Alphabet[s], and the Five Percenter newspaper in their cells. DX 42 at 5-6; Tr. at 167:1-177:16. Director Clarke testified that there were no significant problems with the implementation of this policy while he was commissioner. Tr. at 167:1-177:16. In fact, the policy was later amended to permit NGE adherents to engage in corporate worship, subject to the availability of an external NGE volunteer. DX 42 at 7; Tr. at 177:17-178:10. Similarly, New York permits NGE adherents to observe their four honor days, engage in individual worship, and participate in communal worship using all of their foundational texts (in other words, inmates are allowed to take the texts outside their cells). PX 101 at 27. According to Horn, the policies adopted in these settlement agreements support the conclusion that "the blanket prohibition on [the] NGE in Virginia [is] overly broad and that there [are] clearly other comparable states, states of equal size, equal complexity, equivalent security concerns that were able to treat [the] NGE as a religion and to apply them the same sorts of, if you will, surgical or more precise regulations as they do to all religions." Tr. at 311:13-24. The Court agrees. The VDOC's designation of the

41

NGE as an STG and enforcement of a zero tolerance policy for their activities is neither supported by the evidence in this record nor is it the least restrictive means of furthering a compelling state interest.

The Court also finds that the Department's proposed accommodation—permitting the NGE adherents to elect to be transferred to Wallens Ridge, where they would be housed in a designated housing unit and allowed to practice their beliefs, all while the VDOC continues to designate the NGE as an STG—is also not the least restrictive means of furthering a compelling state interest. First, assuming for the sake of argument that the NGE is truly worthy of the STG designation, it would be irrational to transfer all its adherents to a single facility. Defendant's own expert, Burke, testified that permitting NGE adherents to gather would merely exacerbate the security threat, permit a larger "show of force," and give NGE adherents greater "control" inside the facility. Tr. at 362:8-18, 360:20-22. In actuality, there is no evidence in this record that NGE adherents pose a greater security threat than any other inmates and the VDOC's proposed accommodation would substantially burden NGE adherents such as Coward, who would be required to accept being designated a member of an STG and leave a low-security level 2 facility for a far more restrictive level 5 facility in exchange for the ability to practice his religion. Such a requirement would impose a substantial burden on the plaintiff and, based on the Department's far less restrictive practices for managing Asatru and NOI adherents, the Department has failed to show that it is the least restrictive means of furthering a compelling state interest. In short, the Department is not permitted under RLUIPA to require the plaintiff or other NGE adherents to accept such a tradeoff.

**B. First Amendment (Claim 5)**

1. The Free Exercise Clause

42

In addition to his claims under RLUIPA, plaintiff has raised a claim under the Free Exercise Clause. As the Supreme Court has long recognized, "[i]nmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion," O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (internal citations omitted); however, "[t]o ensure that courts afford appropriate deference to prison officials, [the Supreme Court has] determined that prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights," id. at 349. Thus, when an inmate alleges that prison regulations burden fundamental rights, such as those protected by the Free Exercise Clause of the First Amendment, "the regulation is valid if it is reasonably related to legitimate penological interests," Turner v. Safley, 482 U.S. 78, 89 (1987), and the inmate bears the burden of disproving the validity of the prison regulations, Overton v. Bazzetta, 539 U.S. 126, 132 (2003). This standard of review is "responsive both to the policy of judicial restraint regarding prisoner complaints and to the need to protect constitutional rights." Turner, 482 U.S. at 85 (internal quotation marks omitted).

In assessing the reasonableness of a regulation, courts look to four factors. The first is whether there is "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it." Id. at 89 (internal quotation marks omitted). As the Court elaborated, "a regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational. Moreover, the governmental objective must be a legitimate and neutral one." Id. at 89-90. The second factor "is whether there are alternative means of exercising the right that remain open to prison inmates." Id. at 90. "Where other avenues remain available for the exercise of the asserted

right courts should be particularly conscious of the measure of judicial deference owed to corrections officials . . . in gauging the validity of the regulation." Id. (internal quotation marks omitted). "A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." Id. Although the Court acknowledged that "few changes will have no ramifications on the liberty of others or on the use of the prison's limited resources for preserving institutional order," it emphasized that "[w]hen accommodation of an asserted right will have a significant ripple effect on fellow inmates or on prison staff, courts should be particularly deferential to the informed discretion of corrections officials." Id. Finally, courts should consider whether there are "ready alternatives" available to the prison, the existence of which "may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns." Id. (internal quotation marks omitted).

### 2. Theological Discrimination Against the NGE

Taking account of the different standard applicable to plaintiff's Free Exercise claim, specifically the reasonableness standard announced in Turner and the transfer of the burden to plaintiff, the Court finds that the VDOC's policies regarding the NGE violate the Free Exercise Clause.

As discussed above, plaintiff has demonstrated that the Department has insufficient evidence to support the designation of the NGE as an STG and the Department's asserted interest in suppressing the growth of a violent racially supremacist group. The record before this Court indicates that the Department's initial STG designation in 1996 was not the product of a considered, evidence-driven analysis, nor did Director Johnson's memo purport to designate Five Percent groups as an STG. DX 13. Despite the VDOC's careful monitoring of NGE adherents

for over twenty years and the alleged incidents of violence identified by Burke, the evidence introduced by plaintiff demonstrates that there is no documented nexus between the five identified incidents of violence and the beliefs and practices of the NGE, nor is there any basis to conclude that these incidents are sufficiently interrelated to demonstrate a pattern of violent behavior by NGE adherents. In the absence of such evidence, the Department's policies do not bear a rational relationship to the asserted interest. Rather, the Department "treat[s] exclusively as a gang a group that has had a law-abiding existence outside prison for the better part of [55] years, that is an offshoot of another group that [the VDOC] considers a religion, and that has practices that largely resemble those of recognized religious groups." Marria, 2003 WL 21782633, at *15. Further, the marked disparity between the Department's policies toward the NGE as compared to the NOI and Asatru indicates that the Department's policy is not a neutral one.

As to the second factor, the Department's zero tolerance for NGE activity, including its ban on NGE literature and communal gatherings, provides Coward with no alternative way to exercise his belief system. As to the third factor, even if the Court were to credit the Department's assertion that NGE adherents pose a greater security risk than the average inmate, the testimony of Burke and Robinson demonstrates that the VDOC has been able to accommodate unique security risks posed by other similar religions without undue burden on the Department.

With respect to the last Turner factor, the "readily available alternatives" for safeguarding prison security, which the Department has deployed with the NOI and Asatru, indicate that the policies regarding the NGE are "not reasonable, but [are] an exaggerated response to prison concerns." Turner, 482 U.S. at 90. In sum, there is insufficient evidence in this record to support

45

the Department's designation of NGE as an STG. "The First Amendment demands a more reasoned approach, even within the difficult confines of a prison environment." Wall v. Wade, 741 F.3d 492, 502 (4th Cir. 2014).

## IV. CONCLUSION

For the reasons stated above, the Court finds that the VDOC has violated plaintiff's rights under RLUIPA and the First Amendment by designating the NGE an STG, thereby enforcing a zero tolerance policy that prohibits plaintiff from possessing his sacred texts and associating with other NGE adherents, and refusing to recognize the NGE as a religion. In accordance with this finding, the Department will be ordered to remove the STG designation from the NGE,[22] recognize it as a religion,[23] and afford it the rights and privileges enumerated in the Department's operating procedure for Offender Religious Programs, including but not limited to permitting NGE adherents to observe their four honor days, possess their foundational texts, and engage in communal worship, subject to the availability of an approved spiritual leader and under the

---

[22] See Hardaway v. Haggerty, No. 05-70362 (E.D. Mich. Feb. 25, 2011) (ordering that the Michigan Department of Correction's "designation of the NGE as a STG is in violation of RLUIPA" and "[t]he STG designation of [the] NGE shall be removed"); Hetsberger v. Hayman, No. MIF-L-5546-04 (Iowa D. Ct. Apr. 11, 2008) (ordering that "the New Jersey Department of Corrections and its subdivisions are enjoined from enforcing any and all policies which prevent the plaintiff from practicing the activities that are central to his system of beliefs as a member of the Nation of Gods and Earths"); Marria, 2003 WL 21782633, at *12 ("[W]e cannot find, based on the trial record, that DOCS' classification of the Nation as a security threat group and absolute ban on Nation literature further a compelling security interest and is the least restrictive means of doing so.").

[23] Hardaway v. Haggerty, 2011 WL 761494, at *8 ("[T]he Court has already ruled that the NGE is a religion entitled to protection under RLUIPA."); Hetsberger, No. MIF-L-5546-04; Marria, 2003 WL 21782633, at *12 ("[W]e find that plaintiff's beliefs as a member of the Nation of God's [sic] and Earths are both sincere and 'religious in nature' and therefore entitled to RLUIPA and First Amendment protection under the free exercise clause.").

necessary visual monitoring.[24] This holding does not preclude the Department from placing restrictions on NGE adherents as necessary to maintain security and order, provided that the Department does so within the confines of RLUIPA and applicable prison policies. An appropriate order entering judgment consistent with this finding will be issued with this Memorandum Opinion.

Entered this 28 day of August, 2017.

Alexandria, Virginia

/s/

Leonie M. Brinkema
United States District Judge

---

[24] Hetsberger, No. MIF-L-5546-04 (ordering that "plaintiff shall be permitted to practice the following religious activities without impunity or adverse consequences from the New Jersey Department of Corrections: (a) teaching others about the knowledge of who God is (the righteous and intelligent Black Man who lives Mathematics Supremely), (b) study the Supreme Mathematics, Supreme Alphabets, 120 Degrees, Universal Flag, monthly National statements, and The Son of Man and Five Percenter newspaper periodicals, (c) observe holy days, . . . (d) conduct Civilization Classes, in which senior members educate newer members about the lessons and how they can be applied, and (e) gather monthly for 'Parliaments' and 'Rallies', during which members make collective decisions and aid one another learn their lessons [sic]").